(No. 35842

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* PETER EDWARD KENZIK, Plaintiff in Error.

*Opinion filed September 22, 1961.*

JULIUS LUCIUS ECHELES, of Chicago, for plaintiff in error.

WILLIAM G. CLARK, Attorney General, of Springfield, and DANIEL P. WARD, State's Attorney, of Chicago, (FRED G. LEACH, Assistant Attorney General, and JOHN T. GALLAGHER, and JAMES R. THOMPSON, Assistant State's Attorneys, of counsel,) for the People.

Mr. JUSTICE HOUSE delivered the opinion of the court:

Defendant Peter Edward Kenzik was indicted in the criminal court of Cook County for the murder of his wife. A jury returned a verdict of guilty and fixed his punishment at life imprisonment. He prosecutes this writ of error to review the judgment of conviction.

Defendant and his wife had been separated about four times during their marriage, the final separation occurring about February 1, 1953. Later that month he went to the apartment occupied by his wife and mother-in-law and attempted a reconciliation. On that occasion he threatened his wife with a gun but later handed it to her at her request. He told his wife and mother-in-law he would kill them if they told the police about the incident. On March 13, 1953,

he again went to the apartment and talked with the mother-in-law while waiting for his wife to return from work. After about 20 minutes his wife returned and sat on the couch next to him. The mother-in-law brought them coffee and defendant asked her to leave while he talked with his wife. She went to the kitchen and then heard her daughter scream, "Mama, come quick, Pete is killing me." She rushed into the room and saw defendant stabbing his wife with a knife. The mother struggled with him and he stabbed her until the knife broke. He then left without saying anything. The daughter had been stabbed nine times in and about the chest and twice in the hand. The mother was stabbed five times in the back. They were both taken to the hospital where the daughter died about two hours later.

After defendant left the apartment, he checked in at a hotel under an assumed name where he stayed for two days. He had read in the newspaper that the police were looking for him in connection with the slaying of his wife. He then went to Gary, Indiana, where he stayed two days under an assumed name and after that he spent various amounts of time under various names in Detroit, New York City, Cleveland, Philadelphia, Boston, Buffalo, Cincinnati, St. Louis, Dallas, Houston, Los Angeles, San Francisco and San Diego. He was finally arrested in San Diego on January 25, 1955, and turned over to the Chicago authorities.

He was thereafter indicted for the murder of his wife and tried in May, 1955. A jury found him guilty and fixed his punishment at death. We reversed this judgment of conviction and remanded the cause for a new trial because the defendant had not had a fair trial. (See *People* v. *Kenzik,* 9 Ill.2d 204.) The defendant was again tried in May, 1957. The second jury also found him guilty and fixed his punishment at life imprisonment.

It is first argued that it was reversible error to set this cause for trial seven days after defendant received the list of witnesses the People intended to call. In all felony cases

the People are required by statute to furnish the defendant with a list of witnesses. (Ill. Rev. Stat. 1959, chap. 38, par. 729.) The purpose of the statute is to prevent surprise and to enable the defendant to combat false testimony. (*People* v. *Ford,* 19 Ill.2d 466; *Pepole* v. *Quevreaux,* 407 Ill. 176; *People* v. *Weisberg,* 396 Ill. 412.) We have held, therefore, that it is within the discretion of the trial court to allow unlisted witnesses to testify, (*People* v. *Ford,* 19 Ill.2d 466; *People* v. *Kemp,* 396 Ill. 578; *People* v. *O'Hara,* 332 Ill. 436,) and the trial court's ruling will not be disturbed unless it appears that defendant has been taken by surprise or prejudiced. (*People* v. *Quevreaux,* 407 Ill. 176; *People* v. *Weisberg,* 396 Ill. 412.) The burden of showing surprise or prejudice is on the defendant. *People* v. *La-Coco,* 406 Ill. 303; *People* v. *Nixon,* 371 Ill. 318.

The defendant does not and could not claim to have been surprised, in view of the fact that the trial court granted a continuance of seven days solely on the ground that the list of witnesses had not theretofore been furnished to him. Furthermore, there is no assertion that any of the prosecution's witnesses gave false testimony, and even if this assertion had been made, there is nothing to show that defendant did not have sufficient time to combat such testimony. There is absolutely nothing to indicate an abuse of discretion by the trial court in setting the case for trial seven days after delivery of the list of witnesses.

It is next argued that the trial court erred in forcing defendant to trial under circumstances which deprived him of a competent legal presentation of his case. The record shows that a week before the trial was to begin the defendant, in the absence of counsel, made a motion to the court that his court-appointed counsel, David Bradshaw, be withdrawn as his attorney. The court suggested that Bradshaw make such a motion. The defendant then gave the court a list of lawyers and asked that one of them be appointed to assist him while he represented himself. The court assured

defendant he would appoint competent counsel for him although it might not be one of those suggested.

On the day set for trial, Bradshaw moved that he be permitted to withdraw as counsel because the defendant did not want his services. The defendant again stated that he intended to represent himself and asked the court to appoint an attorney from the tendered list to assist him. The court denied defendant's motion because he felt defendant was merely attempting to delay the trial. The defendant went to trial and conducted his own defense with the assistance of Bradshaw, who consented to remain in the case in that limited capacity upon request of the court.

The record contains a considerable number of discussions that were held with respect to who would represent defendant. The defendant gave as his reasons for not wanting Bradshaw to represent or assist him that Bradshaw was prejudiced, that he had no interest in the case, that he lied under oath, that he was not prepared to try the case and that he was incompetent. Defendant tried to prove these accusations by reading letters he had written to Bradshaw and by examining Bradshaw under oath. Bradshaw answered that he was not prejudiced against defendant and that he was prepared to try the case. The record also shows that Bradshaw has tried hundreds of criminal cases, including many murder cases where the extreme penalty was asked. The trial court properly concluded that there was no basis for defendant's reasons for wanting Bradshaw to withdraw.

The court had previously appointed Kevin J. Gillogly, the Public Defender, and Warren Carey at various times to represent defendant before his first trial. Each of these attorneys withdrew and defendant represented himself at that trial. Carey, who had withdrawn at defendant's request, was the attorney who later successfully appealed from that first judgment of conviction. Nevertheless, de-

fendant, while making accusations against Bradshaw, also made similar accusations against Carey.

It is apparent from the record that defendant either could not or would not permit anyone else to accept the responsibility and control of conducting his defense. The trial court fully and properly, on several occasions, explained to the defendant his right to counsel. Defendant, by his requests to represent himself and by his conduct, knowingly waived his right to be represented by counsel.

Despite the fact that defendant had effectively waived his right to be represented by counsel, the court felt that it should have counsel present to assist defendant during the trial. This is what defendant wanted, but he did not want Bradshaw's assistance. In view of the fact that Bradshaw is a competent criminal lawyer, that he was not to have the responsibility and control of the defense of the case and that he was familar with the case and was ready and willing to assist, we believe that the trial court properly proceeded to trial without appointing another attorney to assist defendant.

Furthermore, the defendant did seek and obtain the assistance of Bradshaw during the trial and the court by continuous supervision maintained proper judicial decorum. At defendant's request, Bradshaw had subpoenaes issued for witnesses defendant desired and the court gave defendant sufficient time to talk with the witnesses before they testified, he consulted with Bradshaw as to the procedure to be followed in picking a jury and was advised of the number of peremptory challenges he had, Bradshaw obtained a prior statement of a witness that defendant wanted, the court at defendant's request cross-examined the pathologist as to the number of stab wounds found in the body of the deceased, and the court carefully explained to defendant his right to testify or not. When defendant announced he was going to comment to the jury on his failure to testify,

Bradshaw and the court advised him that it would open the door for the People to show a previous conviction. And when defendant said he was going to tell the jury he had cohabited with his wife before their marriage, Bradshaw and the court advised him not to do so. Bradshaw prepared 22 instructions which defendant requested the court to give, and, with defendant's consent, he actively participated in the conference on instructions. After the verdict was returned, the jury was polled at the court's request.

A reading of the record leads to the inescapable conclusion that the trial court did not deny the defendant a competent legal presentation of his case but, on the contrary, did everything possible to assure defendant of a proper presentation of his defense. There is no question but that a person being tried for murder should be represented by counsel, but the court could not force the defendant to be represented. (See *People* v. *Ephraim,* 411 Ill. 118.) The defendant had the right to conduct his own defense, (*People* v. *Burson,* 11 Ill.2d 360,) and he knowingly chose to exercise this right. The trial court conducted the proceedings in a commendable manner and the defendant, with the assistance of Bradshaw, made an adequate presentation of his defense.

The defendant next contends that the People failed to prove beyond a reasonable doubt that he was sane at the time of the crime. The defendant in his opening statement to the jury stated that his defense was that of temporary insanity, and while the mother-in-law was on the witness stand, defendant cross-examined her as follows:

"Q. * * * Mrs. Erikson, from your close observation of my state of mind on this evening, of March 13, 1953, it would be your opinion that I was crazy at the time this happened to you and your daughter?

A. I couldn't say. I don't think you was because you didn't seem to be. and you knew what you was doing."

Aside from these remarks, there was no evidence introduced

concerning defendant's sanity at the time of the crime. Defendant's witnesses did testify that he was intoxicated on the day of the crime, but this certainly is not evidence of temporary insanity. See Paulsen, Intoxication as a Defense to Crime, 1961, U. Ill. L.F. 1.

It is a basic principle that the law presumes all men to be sane and, in the absence of evidence to the contrary, the prosecution is under no duty to prove that defendant was sane at the time of the crime. (*People* v. *Robinson, 22* Ill. 2d 162; *People* v. *Jones,* 6 Ill.2d 252.) In this case there was no evidence tending to overcome the presumption of sanity; on the contrary, the only witness asked for an opinion of defendant's sanity at the time of the crime answered that she thought he knew what he was doing.

Although the defendant used the term "temporary insanity" at his trial, a reading of the record indicates that he used the term to describe a state of mind caused by intoxication. A good example to illustrate this conclusion is the colloquy that occurred in chambers between defendant and the court after defendant had produced all his witnesses and had asked the court if he might read a letter to the jury which evidently indicated that his sister had been in a mental institution:

"The Court: Yes, how does that help this jury to determine your guilt or innocence?

The Defendant: This defense, your Honor, is temporary insanity and I would like to point out to the jury that there has been an insanity in my family.

The Court: Well, you state that your defense is temporary insanity but there is no evidence of it.

The Defendant: Your Honor, there is, from the testimony of the witnesses on the witness stand. They had testified that I have been drunk on this day, and that renders a person unconscious at the time of the crime. I believe that is a proper defense according to Illinois statutes."

The trial court refused to allow the letter into evidence and defendant rested his case.

The refusal to admit this letter into evidence is now assigned as error. The theory of defendant's defense was that he was intoxicated to the point where he was incapable of forming a specific intent and he had not formed an intent to commit the crime prior to intoxication. All of the evidence introduced by him was directed at supporting this defense and, as we have already mentioned, there was no evidence of insanity, temporary or otherwise. The inference to be raised by the letter was so remotely connected to defendant's defense of intoxication and his mental capacity at the time of crime that it was properly excluded as being immaterial. See *People* v. *Holt,* 398 Ill. 606.

Defendant also asserts that the trial court erroneously excluded evidence of defendant's strained relations with his wife. There was evidence that defendant and his wife had been separated on about four occasions and that there had been several unsuccessful attempts at reconciliation during the last separation. Thus, there was evidence before the jury of defendant's strained relations with his wife. The ruling complained of was proper, however, because the testimony excluded was hearsay.

It is also argued that the court allowed hearsay testimony into the record. Officer McQueen testified that he learned from defendant's landlady that defendant had put his television set in storage. He was about to say what else he learned from the landlady when the court stopped him because the testimony was hearsay. Officer Holmes testified that he had information that defendant was at a certain address in New York City but learned from the New York police that there was no such address. The court on both of these occasions stopped the presentation of hearsay evidence. We believe that the trial court acted promptly and that the hearsay testimony heard was not prejudicial.

Defendant next contends that the trial was conducted in

an atmosphere of such impatience and exasperation with his attempts to secure adequate presentation of his case that he was denied a fair and impartial hearing. He asserts that certain statements by the court to the effect that defendant was employing delaying tactics and attempting to shift responsibility for defense of the case to the court support this contention. When these remarks are read in context they do not show that the judge was impatient. Furthermore, they were not made before the jury. A reading of the record reveals that the trial judge displayed remarkable patience with defendant before the jury and in chambers.

It is finally argued that the prosecuting attorney made inflammatory and opinionated statements in his closing argument. It would make this opinion unduly long to point out where the complained-of statements were not inflammatory or opinionated. We have examined the statements closely and find that they were based on competent evidence in the record or properly answered statements made by defendant in his closing argument.

The defendant has not argued that his guilt was not proved beyond a reasonable doubt. We have carefully examined the record and find that he received a fair and impartial trial. The judgment of the criminal court of Cook County is accordingly affirmed.

*Judgment affirmed.*